TRANSCARDIAC THERAPEUTICS, INC., Plaintiff,

v.

Ajit YOGANATHAN, PH.D., Jorge H. Jiminez, PH.D., Vinod H. Thourani, M.D., Emory University, Georgia Tech Research Corporation, and Georgia Tech Foundation, Inc., Defendants.

Civil Action No. 1:13–CV–3089–AT.

United States District Court, N.D. Georgia, Atlanta Division.

Signed Feb. 28, 2014.

---

James Robert Howard, Office of James Robert Howard, John W. Crongeyer, Crongeyer Law Firm, P.C., Kristen Lin Beightol, William Q. Bird, Bird Law Group, P.C., Atlanta, GA, for Plaintiff.

Julie Adams Jacobs, State of Georgia Law Department, William Wright Banks, Jr., Office of State Attorney General, Jill Warner, McRae Brooks Warner, LLC, C. Allen Garrett, Jr., Joel D. Bush, II, Robert Edward Buckley, Kilpatrick Townsend & Stockton, Holmes J. Hawkins, III, King & Spalding, LLP, Atlanta, GA, for Defendants.

### ORDER

AMY TOTENBERG, District Judge.

Before the Court is Plaintiff TransCardiac Therapeutics, Inc.'s Motion for Remand which explores the limits of federal patent jurisdiction over state law claims [Doc. 16]. Defendant Emory University removed this case based on the existence of federal question jurisdiction under 28 U.S.C. § 1338(a). In its Notice of Removal, Emory admits that none of Plaintiff's state law claims directly seek relief under federal patent law. Nevertheless, Emory argues that Plaintiffs Complaint necessarily implicates issues of patent inventorship, thereby establishing federal jurisdiction under § 1338(a). For the following reasons, Plaintiff's Motion for Remand [Doc. 16] is **GRANTED.**

## I. Background

### A. Dr. Lattouf's Invention

Dr. Omar Lattouf is a professor specializing in cardiothoracic surgery at the Emory University School of Medicine. As an Emory faculty member, Dr. Lattouf conducted research in the field of cardiac surgery. He invented a minimally invasive form of cardiac surgery involving transapical access to the heart and took steps to patent this new medical procedure. (Compl., Doc. 1–1 ¶ 42.) On December 8, 2001, Dr. Lattouf filed U.S. Patent Application No. 60/340,062 ("the '062 applica-

tion") describing this method.[1] (*Id.* ¶ 42, 113.)

By itself, this patent application did not secure Dr. Lattouf an ownership interest in this invention. Emory professors, like those at many universities, do not simply keep what they invent.[2] Generally, Emory assumes ownership of the intellectual property ("IP") created by its personnel as a condition of access to university resources and support. Emory personnel are required to promptly disclose new IP to the Office of Technology Transfer ("OTT"), which estimates the commercial value of the IP and may help inventors file patent applications.

Emory's IP policy describes a mechanism to release or assign ownership of IP back to an inventor. Upon petition by an inventor, Emory may transfer IP back to an inventor while retaining a limited financial interest, often in the form of regular royalty payments. Through this process Emory inventors may commercialize their invention with support from the university, and Emory gains a modest financial stake in the technology's success.

Dr. Lattouf promptly notified Emory of his invention and the '062 application. (*Id.* ¶¶ 43, 44.) He met with the OTT to discuss the commercialization of this technology, and the parties negotiated terms of Emory's assignment of the IP to Dr. Lattouf. The parties agreed that Emory would receive 2% of net sales for products sold by Dr. Lattouf, or any assignee, licensee, or affiliate of his, which incorporated Dr. Lattouf's invention. (*Id.* ¶ 45.) Dr. Lattouf and the OTT finalized this release agreement around September 30, 2002. (*Id.* ¶ 46.)

At the time of the agreement, the parties defined the relevant intellectual property ("the Release IP") as what was disclosed in the '062 application and Dr. Lattoufs invention disclosure to Emory. (*Id.* ¶ 44.) Dr. Lattouf continued to make improvements to his invention in the years following this agreement. These improvements were captured in over two dozen patent applications.[3] (*Id.* ¶¶ 68–71, 112–116.) Dr. Lattouf and Emory amended the scope of the Release IP[4] in February 2005 and again in May 2009 to encompass these improvements, which also included "[i]ssued patents disclosing and claiming" the subject matter of these patent applications. (*Id.*) These amendments assigned Dr. Lattouf ownership over his improvements to the original invention under the same terms as the original 2002 agreement. (*Id.* ¶ 71; Ex. E, Doc. 2–1.)

After securing ownership of the Release IP, Dr. Lattouf founded TransCardiac Therapeutics, LLC ("TCT") on September 4, 2003.[5] Dr. Lattouf assigned his interest in the Release IP to TCT to facilitate the

---

1. This patent application was titled "Endoscopic [T]ransthoracic Epicardiac, Endocardiac and Endoaortic/Endovascular Interventional Therapy."

2. Emory University's Intellectual Property Policy is publicly available at http://policies.emory.edu/7.6# 1. The Court considers this policy only to better understand the context of Plaintiff's allegations and not when evaluating the merits of the underlying motion.

3. In total, 26 additional patent applications are based on improvements to Dr. Lattoufs invention, including U.S. provisional, nonprovisional, European Union, and Paris Cooperation Treaty applications. (*Id.* ¶ 112.)

4. As used throughout, the term "Release IP" includes the original invention and all subsequent improvements described in the amendments between Emory and Dr. Lattouf.

5. TransCardiac Therapeutics, LLC was converted into TransCardiac Therapeutics, Inc. on April 30, 2008. (*Id.* ¶ 48.)

commercialization of the technology. (*Id.* ¶ 118.) Emory provided TCT with support and advice about the commercialization process, in part to benefit from its stake in TCT's success. The terms of the release agreement with Emory required Dr. Lattouf and TCT to disclose further improvements in the Release IP. (*Id.* ¶ 57.) In December 2004, TCT entered into an 8–year confidential disclosure agreement ("CDA") with Emory. (*Id.* ¶¶ 55–56.) This agreement supplemented any existing duty of confidentiality between the parties, and encouraged the complete disclosure of TCT's technology to Emory. (*Id.*)

### B. Contract with Dr. Yoganathan

In February 2005, TCT executives met with Defendant Dr. Yoganathan and others serving as representatives of Defendants Georgia Tech Research Corporation ("GTRC") and Georgia Tech Foundation ("GTF"). (*Id.* ¶¶ 72–73.) TCT sought additional means to manufacture and test the Release IP technology, and Dr. Yoganathan managed the necessary facility and personnel on behalf of GTRC and GTF. (*Id.* ¶¶ 20, 80.) Dr. Yoganathan agreed that his existing research would not compete in any way with Dr. Lattouf or TCT if he were selected to assist with the Release IP. (*Id.* ¶ 77.)

Drs. Lattouf and Yoganathan ultimately reached an agreement. In March 2005, Dr. Lattouf requested a price quote to build and test his invention. The services of Dr. Yoganathan, his assistant, Defendant Dr. Jiminez, and the facility were offered for $10,000. (*Id.* ¶ 80.) On July 22, 2005, Dr. Lattouf paid this amount to GTF by means of an "Emory Discretionary Fund for the benefit of TCT." (*Id.* ¶ 80, 90.) Beginning in 2005, Dr. Yoganathan and Dr. Jiminez conducted testing and research into the technology of the Release IP. (*Id.* ¶ 89.)

TCT understood this arrangement to be work-for-hire that would not diminish the value of the Release IP. (*Id.* ¶ 80, 161.) TCT received oral assurances from Dr. Yoganathan and the other representatives that TCT's proprietary information, confidential information, and intellectual property would be protected and not disclosed to anyone. Dr. Yoganathan and the other representatives promised to deliver an acceptable non-disclosure agreement that memorialized the representations of confidentiality, but TCT was never given this agreement. (*Id.* ¶¶ 76, 81–84.) Throughout its engagement with the Georgia Tech Defendants, TCT relied on oral assurances and institutional standards of confidentiality from Dr. Yoganathan, GTRC, and GTF. (*Id.* ¶¶ 81–84.)

### C. Scientific Advisory Board

In 2005, TCT invited researchers to join its newly formed Scientific Advisory Board ("SAB"). Dr. Yoganathan accepted this invitation and served on the SAB from its inception. As a condition of serving on the SAB, Dr. Yoganathan agreed to respect and protect all of TCT's confidential and proprietary information. (*Id.* ¶ 100.) Defendant Dr. Thourani, a physician in the field of cardiothoracic surgery and an employee of Emory, also agreed to join the SAB in 2005. (*Id.* ¶ 59.) Dr. Thourani agreed to substantially the same terms of confidentiality as Dr. Yoganathan.

Both Defendants received confidential and proprietary information and knowledge of the Release IP through their participation on the SAB. (*Id.* ¶¶ 59, 101.) These Defendants signed a TCT Scientific Advisory Board Agreement ("SABA") in 2008. (*Id.* ¶¶ 103, 106.) Dr. Yoganathan initialed and noted beside the SABA's conflict of interest paragraph that he consulted "with other companies, big + small, who work in the heart valve repair and

replacement fields." (*Id.* ¶ 103.) Dr. Thourani, despite never resigning from the SAB, joined a competitor's SAB in 2007. (*Id.* ¶ 107.) According to Dr. Thourani's curriculum vitae from late 2012, he considered himself as having withdrawn from TCT's SAB after 2009. (*Id.*) Dr. Thourani did not report either of these developments to TCT. (*Id.*) Relying on Dr. Thourani's confidentiality agreements, Dr. Lattouf taught Dr. Thourani his transapical access and chordal replacement methods. (*Id.* ¶¶ 93–94.) Dr. Thourani ultimately took over for Dr. Lattouf by directing the research and development efforts that took place at the Georgia Tech labs. (*Id.* ¶ 94.)

### D. Interest from Venture Capital

By 2010, venture capital groups were demonstrating interest in Dr. Lattouf's area of research. Dr. Lattouf emailed Dr. Yoganathan on October 8th, 2010 with the message that "all of a sudden, 3 separate groups [ . . . ] have independent of one another approached me about a deal on my transapical access and mitral/chordal repair." (*Id.* ¶ 125.) In November 2010, AMY Partners made an offer to buy or license TCT's technology "that was preliminarily expressed as $45 million dollars plus a three (3) percent royalty for TCT's property." (*Id.* ¶ 120.) TCT notified Emory of this offer on November 18, 2010, and the parties met shortly after. (*Id.* ¶¶ 121, 123.)

This was as close as TCT came to a deal with AMV Partners. Plaintiff alleges that on or about January 10, 2011, the Defendants began a misleading public relations campaign to portray the individual Defendants as the owners and inventors of specific parts of Dr. Lattouf's IP. (*Id.* ¶ 128.) According to the Complaint, Emory and Georgia Tech deliberately issued press releases claiming that Defendants invented the Release IP. (*Id.* ¶¶ 129–131.) Additional articles from Defendants identified other companies that received funding based on TCT's technology. (*Id.* ¶¶ 129–130, 157.) This action by Defendants "confused, if not destroyed, the market for the IP in question." (*Id.* ¶ 131.)

None of the Defendants advised TCT of any competing interest in the relevant field. (*Id.* ¶¶ 123–124.) Plaintiff claims that Defendants supported a rival startup company, Apica Cardiovascular Technologies, Inc., in an effort to greater capitalize on TCT's technology. (*Id.* ¶¶ 129, 133–135.) Plaintiff believes that Emory and GTRC improperly licensed TCT's IP to Apica. (*Id.* ¶¶ 133–134.) Furthermore, Plaintiff believes Emory was assisting Apica around the same time it was reviewing the AMV Partners' offer to TCT. (*Id.*) Emory never disclosed this apparent conflict to TCT; this omission breached both legal duties and ethical duties promulgated by Emory and Georgia Tech. (*Id.* ¶¶ 134–135, 142–152.) Plaintiff believes that "all Defendants have operated to promote their startup company as the false inventor and/or owner of the IP in question" and intentionally portrayed Drs. Yoganathan, Jimenez, and Thourani as the actual inventors instead of Dr. Lattouf. (*Id.* ¶¶ 129, 166.)

Based on these facts, Plaintiff alleges the following state law claims: 1) breach of contract; 2) breach of oral contract; 3) breach of duty of confidential relations; 4) tortious interference with business relations; 5) tortious interference with contract; 6) breach of legal duties and contract; 7) fraud; 8) conspiracy; and 9) false advertising. Defendant Emory removed this case on September 16, 2013, and Plaintiff moved to remand on October 14 2013. (Not. Removal, Doc. 1; Doc. 16.)

### II. Legal Standard

■ "Federal courts have exclusive jurisdiction over cases 'arising under any Act

of Congress relating to patents.'" *Gunn v. Minton*, —— U.S. ——, 133 S.Ct. 1059, 1062, 185 L.Ed.2d 72 (2013) (quoting 28 U.S.C. § 1338(a)). Federal jurisdiction under § 1338(a) exists only where a well-pleaded complaint: 1) alleges a cause of action created by federal patent law, or 2) a "plaintiffs right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). Defendant concedes that none of Plaintiffs claims seek relief under federal patent law. (Doc. 1 ¶ 7.) Thus the sole issue presented is whether these state law claims are so intertwined with patent law that they fall within the second category of *Christianson.*

The Supreme Court has articulated a four-part test that outlines this inquiry. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 133 S.Ct. at 1065 (citing *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005)). All of these elements must be present in at least one of Plaintiff's claims to support federal jurisdiction.

 As the removing party, Defendant bears the burden of establishing federal jurisdiction. *See Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1207 (11th Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "The test ordinarily applied for determining whether a claim arises under federal law is whether a federal question appears on the face of the plaintiff's well-pleaded complaint." *Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1343 (11th Cir.2009). "[A]n anticipated or even inevitable federal defense generally will not support removal based upon federal question jurisdiction." *Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir.1998) (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392–93, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)).

## III. Discussion

 Defendant Emory's position is that Plaintiffs Complaint presents substantial and unavoidable issues of inventorship. (Doc. 1 ¶ 8.) "Inventorship" is a patent term for the named inventor or inventors on a U.S. patent or patent application. *See Falana v. Kent State Univ.*, 669 F.3d 1349, 1358 (Fed.Cir.2012); *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1357 n. 1 (Fed.Cir.2004). "[Patent] inventorship is indisputably a question of federal patent law." *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd.*, 600 F.3d 1347, 1355 (Fed. Cir.2010). State law claims which necessarily require resolution of the inventorship of a patent or patent application may support federal jurisdiction under § 1338(a). *Id.* at 1353; *Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.*, 599 F.3d 1277, 1283 (Fed.Cir.2010) (issues of inventorship may support jurisdiction under § 1338(a)); *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1330 (Fed.Cir.1998). Defendant contends that one or more of Plaintiff's state law claims implicate inventorship sufficiently to supply federal jurisdiction, and that the Court should exercise supplemental jurisdiction over the remainder of Plaintiff's claims.

### A. Patent Inventorship and the State Law Claims

Defendant argues that nearly all of Plaintiff's claims hinge on showing that

Defendants made false statements of invention. Defendant believes that four of the claims require "proving that Dr. Lattouf invented the inventions and that [D]efendants' public statements of inventorship are false and caused the [P]laintiff's damage."[6] (Opp. Br. Remand, Doc. 20 at n, internal quotation omitted.) Another four claims arguably require "TCT [to prove] false statements of patent ownership."[7] (*Id.* at 12.) Defendant believes that establishing the inventorship of Release IP patents and patent applications is a necessary element of these allegations.

Defendant identifies the following allegation from Plaintiffs tortious interference claim as an example; "Defendants ... wrongfully publicly represented that they invented certain of the Release Letter IP, First Amendment Improvements and/or Second Amendment Improvements." (Doc. 1–1 ¶ 198; Doc. 20 at 10–11.) Defendant takes the position that this and other claims necessarily turn on the inventorship of the patents and patent applications defined in the Release IP. Defendant argues that to prevail on its claims, Plaintiff must prove that Dr. Lattouf invented the technology described in the Release IP, thereby implicating issues of inventorship. (Doc. 20 at 11.)

The Court applies the four-part *Gunn* test to this argument.

### 1. Necessity

■■■■ Not all of Plaintiff's claims "necessarily" present an issue of inventorship. Inventorship must be an essential element of a state law claim for federal jurisdiction under § 1338(a). *Gunn,* 133 S.Ct. at 1065.

"[T]he appearance of 'an alternative, non-patent theory' which may entitle the plaintiffs to their requested relief compels the conclusion that the cause of action does not arise under the patent laws." *HIF Bio, Inc.,* 600 F.3d at 1354 (quoting *Christianson,* 486 U.S. at 813, 108 S.Ct. 2166).

Counts II, V, and VII present such alternative theories of recovery. Plaintiff's claim for breach of oral contract (Count II) alleges that all Defendants except Emory orally contracted to "keep information shared with them regarding the [Release IP] and subsequent improvements confidential," and that Defendants breached this duty by sharing confidential information. (Doc. 1–1 ¶¶ 184–187.) The claim for tortious interference with contract (Count V) alleges that all Defendants besides Emory "knowingly encourage[ed] business ventures which frustrated, if not destroyed, the value of Plaintiff's contracts [with Emory], and damaged, if not destroyed, the [Release IP], and knowingly misused confidential information." (*Id.* ¶ 205.) Likewise, Plaintiff's claim for fraud (Count VII) includes allegations that Defendants fraudulently misrepresented that they would protect Plaintiff's confidential and proprietary information, and that Defendants concealed and supported a competing venture. (*Id.* ¶¶ 213–225.) Each of these three claims may be litigated without reaching issues of inventorship. Because they do not necessarily present a patent issue, the above claims cannot support federal jurisdiction under § 1338(a).

■■■ The remaining claims[8] involve allegations that Defendants falsely claimed in-

---

6. Defendant believes the claims for breach of express contract, tortious interference with business relations, conspiracy, and false advertising fall within in this category. (Doc. 20 at 9–10.)

7. In this category, Defendant includes Plaintiff's claims for breach of confidential rela-

tions, tortious interference with contract, breach of legal duties and contract, and fraud. (Doc. 20 at 10–11.)

8. These comprise Plaintiff's claims for breach of contract (Count I), breach of duty of confidential relations (Count III); tortious interfer-

vention of the Release IP. Defendant leans heavily on a Federal Circuit case to demonstrate why patent law is necessarily implicated by these claims. *See HIF Bio, Inc.*, 600 F.3d 1347. Among other claims, the plaintiffs in *HIF Bio* alleged that they were the first to invent a particular invention, and that defendants' competing patent applications supported a cause of action for slander of title.[9] *Id.* at 1355. The allegations defined the invention at issue "solely in terms of the [defendants'] pending patent applications." *Id.* at 1353. The court stated that the slander of title claim required a determination of who first invented the subject matter of the defendants' pending applications. *Id.* at 1355. Therefore, the claim necessarily implicated the inventorship of those patent applications and thus invoked federal jurisdiction.[10] *Id.* at 1355.

The most significant resemblance between this case and *HIF Bio* is that both define the relevant invention in terms of patents or patent applications. The Release IP in this case is essentially a collection of patents and patent applications naming Dr. Lattouf as inventor.[11] Defendant argues that for Plaintiff to succeed on its claims that Defendants falsely portrayed themselves as inventors, Plaintiff must "prov[e] that Dr. Lattouf invented the inventions[.]" (Doc. 20 at 11.) Be-

cause the Release IP is framed as a series of patent documents, Defendant contends that proving this element requires the Court to make determinations of inventorship.

▮▮▮▮ This case and *HIF Bio* are similar, but not analogous. The dispositive issue for the court in *HIF Bio* was that the slander of title claim would necessarily require litigating the inventorship of the defendants' pending U.S. patent applications. The court would have to "determin[e] the true inventor of an invention disclosed in a pending patent application" for plaintiffs to prevail. *HIF Bio, Inc.*, 600 F.3d at 1355. However, the Release IP in this case was explicitly defined to include patents issuing from the listed patent applications. The U.S. Patent and Trademark Office's application database[12] reveals that at least two (albeit expired) patents have issued from these applications: U.S. Patent Nos. 6,978,176; and 7,373,207. This is important because "[i]ssued patents are presumed valid absent proof to the contrary," and Plaintiff may rely on that presumption without raising an inventorship issue that would confer federal jurisdiction. *Bd. of Regents, Univ. of Texas Sys., ex rel. Univ. of Tex. at Austin v. Nippon Tel. & Tel. Corp.*, 414 F.3d 1358, 1363 (Fed.Cir.2005); *Speedco, Inc. v. Estes*, 853 F.2d 909, 913 (Fed.Cir.

---

ence with business relations (Count IV); breach of legal duties and contract (Count VI); conspiracy (Count VIII); and false advertising (Count IX).

9. Even though the *HIF Bio* decision predates *Gunn*, the *HIF Bio* court's careful consideration of whether patent law was "essential" to state claims mirrors the necessity element of *Gunn*. *HIF Bio, Inc.*, 600 F.3d at 1355.

10. The court also found that courts are precluded from making inventorship determinations of pending patent applications under 35 U.S.C. § 116. *HIF Bio*, 600 F.3d at 1355.

11. The Release IP also encompasses two Emory University Invention Disclosures. The Complaint does not indicate whether these address IP outside of the patent documents.

12. See http://portal.uspto.gov/pair/PublicPair. The Court may take judicial notice of facts available from public records. *See Universal Express, Inc. v. S.E.C.*, 177 Fed.Appx. 52, 53 (11th Cir.2006) (in the context of a motion to dismiss, "[p]ublic records are among the permissible facts that a district court may consider") (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999)).

1988) (a plaintiff "would not need to prove as an element of his well-pled contract claim that [his] patent is valid").

Thus, by showing that Defendants falsely claimed themselves as inventors of subject matter claimed in an issued patent, Plaintiff has a pathway to relief on its claims that does not require litigation of inventorship. As a result, the Court could comfortably determine that inventorship is not a necessary aspect of Plaintiffs claims and terminate its *Gunn* inquiry here. *See ClearPlay, Inc. v. Abecassis*, 602 F.3d 1364, 1367 (Fed.Cir.2010) ("if there is a theory of liability for each of the asserted claims for which it is not necessary to resolve an issue of federal patent law, the district court lacked jurisdiction under section 1338"). But the Complaint doesn't state precisely what portion of the Release IP is relevant to Plaintiff's claims. Based on the Complaint and Notice of Removal, the Court has no way to determine whether the dispute over the Release IP extends to issued patents or is limited to patent applications.

Given this uncertainty, the Court affords Defendant the benefit of the doubt that Plaintiffs claims exclusively relate to the subject matter of patent applications, and that Plaintiff cannot invoke an issued patent's presumption of validity. Defendant's core argument would still reflect that of *HIF Bio:* inventorship is a necessary issue because the Release IP is defined as a series of patent applications, and Plaintiff must show that Dr. Lattouf is the true inventor of the Release IP to prevail. But even if the Court proceeded here under the assumption that resolution of inventorship is a necessary issue, these claims do not satisfy the next requirement of the *Gunn* test.

### 2. Actual Dispute

 Defendant asserts that federal jurisdiction is appropriate because inventorship is actually disputed here. (Doc. 20 at 16–17.) Defendant takes this position broadly without articulating exactly where the Complaint presents a question of inventorship. In the absence of patent counterclaims, the well-pleaded complaint rule governs whether a state law claim necessarily raises a federal issue that is actually disputed. *See MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 720 F.3d 833, 841 (11th Cir.2013). Thus, the Court looks to Plaintiffs Complaint to see if the claims themselves present a tangible inventorship dispute.

Considering the Complaint and Defendant's Notice of Removal, none of Plaintiffs claims present an actual inventorship dispute. Allegations that Defendants: "publicly represent[ed]" themselves as inventors of the Release IP; "announc[ed] false claims of invention and assignment" of the Release IP; or "falsely claim[ed] invention and ownership" of the Release IP represent the heart of this dispute. (Doc. 1–1 ¶¶ 179, 195, 210.) Critically, Plaintiff does not allege that Defendants are falsely claiming inventorship of any Release IP patents or patent applications. Rather, Plaintiffs alleged harm flowed from Defendants falsely claiming that they invented the novel surgical method or improvements described by the Release IP. In other words, Plaintiff alleges that Defendants falsely claimed themselves as inventors of some particular technology, without reference to inventorship.

This distinction is illustrated by inspecting one of Defendants' allegedly false public statements. Plaintiff specifically identifies a February 10, 2011 Georgia Tech press release as an example of the Defendants' misrepresentations.[13] (Compl.

13. *See* http://shared.web.emory.edu/whsc/ news/releases/2011/02/georgia-tech-and-

¶ 129.) The article discusses a medical device startup company created to spread an improved technique for transapical access and closure, and states that "Apica Cardiovascular was founded in 2009 based on technology invented by Jimenez, Thourani, Yoganathan" and another co-inventor. There is no mention of patents or patent applications. The article concludes that Apica "licensed the Georgia Tech/Emory technology," again without any reference to patents or patent applications.

The Complaint is clear that Dr. Lattouf invented all the patents and patent applications that constitute the Release IP. (Doc. 1–1 ¶¶ 42–43, 46, 68–71, 116.) Plaintiff alleges that it has never received a claim of co-ownership or co-inventorship of the Release IP by Defendants. (*Id.* ¶154.) The allegations unambiguously assert Dr. Lattouf is the true inventor of the Release IP patents and patent applications. And the Complaint does not identify any competing patents or patent applications belonging to Defendants that are relevant to these claims.[14]

Furthermore, litigation of Plaintiffs claims would not affect any party's patent rights. Neither a favorable nor adverse ruling for Plaintiff on its state law claims would impact the inventorship of the Release IP patents and patent applications. Plaintiff need not challenge the named inventors of a competing patent or patent application to prove that Defendants falsely represented themselves as inventors of Release IP technology. Defendant argues that these claims may somehow impact the patents and patent applications that describe Dr. Lattouf's invention. Yet even Defendant concedes that such an outcome is far from guaranteed: "TCT's allegations *could* have ongoing implications for the issued U.S. Patents and pending Patent Applications involved in this dispute." (Doc. 20 at 17, emphasis added.)

Plaintiff's Complaint, by itself, simply does not involve an actual dispute over inventorship. The fact that Plaintiff may attempt to use patent applications, or the presumption of validity given to issued patents, to show that Defendants did not themselves invent the Release IP does not present an actual inventorship dispute sufficient to confer federal jurisdiction. While arguing that federal jurisdiction exists for these claims, Defendant contemplates further developments in this case, such as filing patent counterclaims for declaratory relief.[15] But as the case currently stands, the litigation of Plaintiff's claims would not require the Court to rule on the inventorship of any patents or patent applications.

### 3. Substantial Issue

The Court also doubts the Complaint presents a substantial inventorship issue. *See Bd. of Regents,* 414 F.3d at 1363; *Speedco, Inc. v. Estes,* 853 F.2d at 913. A "substantial" federal issue in this context considers "the importance of the issue to the federal system as a whole." *Gunn,* 133 S.Ct. at 1066. Given that litigation of Plaintiffs claims would not alter the patent rights of either party or require Plaintiff to challenge the validity of a patent or patent application, any inventorship issue

---

emorystartup-apica-receives-investment.html.

**14.** In its opposition to remand, Defendant identifies for the first time one patent application and two issued patents that list Drs. Yoganathan and Jimenez as inventors; presumably these patent documents are within the same field of cardiac surgery. (Doc. 20 at

5 n. 3.) However, Defendant does not actually explain how they relate to the Release IP.

**15.** Defendant "anticipates filing a counterclaim seeking declaratory relief relative to the patent inventorship issues raised by TCT's claims." (Doc. 20 at 25.)

is "not substantial in the relevant sense." *Id.; see also Forrester Envtl. Servs., Inc. v. Wheelabrator Technologies, Inc.,* 715 F.3d 1329, 1335–36 (Fed.Cir.2013).

### 4. Federal–State Balance

The final *Gunn* inquiry is whether a state law claim is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn,* 133 S.Ct. at 1065. Plaintiffs state law claims sound in contract and in tort, areas squarely within traditional state interests. Since these claims do not otherwise meet the threshold for federal jurisdiction, there is no need to examine whether litigation in a federal forum would upset this balance.

### B. Supplemental Jurisdiction

Defendant asks the Court to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) and § 1454(d)(1) over any of Plaintiff's claims that do not support federal jurisdiction. (Doc. 20 at 22.) Defendant claims that the § 1367(c) factors and its anticipated patent counterclaim weigh against remand of claims in this case. But since none of Plaintiffs state law claims provide federal jurisdiction, the Court has no basis on which to exercise supplemental jurisdiction here.

### IV. Conclusion

For the above reasons, Plaintiffs state law claims provide no grounds to exercise federal jurisdiction under 28 U.S.C. § 1338(a). Since no other jurisdictional basis is alleged, the Court concludes that it lacks federal jurisdiction.[16] Accordingly, Plaintiffs Motion for Remand [Doc. 16] is **GRANTED.** The Court **REMANDS** this case to the State Court of Fulton County.

---

16. Because the Court finds it lacks jurisdiction over the case, it does not reach Defen-

The Clerk is **DIRECTED** to close this case.

dant's sovereign immunity argument against remand. (Doc. 20 at 20.)